Donald J. Kennedy
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005
Tel: (212) 238-8707
Fax: (212) 732-3232
*Attorneys for Petitioner Polsteam Shipping Company, Limited*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
                                                            :
In the Matter of the Arbitration,                           :
                                                            :
        -Between-                                           :
                                                            :
Polsteam Shipping Company, Limited,                         :
                                                            :
                              Petitioner,                   :    PETITION TO COMPEL
                                                            :    ARBITRATION IN LONDON
                                                            :    AND STAY ARBITRATION
        -And-                                               :    IN NEW YORK
                                                            :
Caytrans Project Services Ltd.,                             :
                                                            :    08 Civ.  5372 (DAB)
                                                            :
                              Respondent.                   :
                                                            :
                                                            :
                                                            :
--------------------------------------------------------------X


        Petitioner, Polsteam Shipping Company Limited ("Petitioner"), by its attorneys,

Carter Ledyard & Milburn LLP, alleges upon information and belief as follows:


        1.      This petition is to compel arbitration in London and stay arbitration in

New York in accordance with the provisions of the Federal Arbitration Act, 9 U.S.C. §1,

et seq., in that this Court would have admiralty and maritime jurisdiction of the disputes

which are the subject matter of this petition save for the below quoted arbitration provision of the relevant fixture recap.

2.     Petitioner, at and during all the times hereinafter mentioned, was and still is a corporation duly organized and existing under and by virtue of the laws of Cyprus, with an office and place of business in c/o its agent, Polsteam USA, Inc., 17 Battery Place, New York, New York 10004, and was the disponent owner of the M/V Orla.

3.     Respondent, Caytrans Project Services Ltd. ("Caytrans"), at all times hereinafter mentioned, was and still is a legal entity duly organized and existing under and by virtue of the laws of a foreign country, and was the time charterer of the M/V Orla for a trip.

4.     On March 19, 2007, petitioner entered into a time charter for a trip with respondent for the use of the M/V Orla on a voyage from the U.S. Gulf to Cuba. A written charter party was not prepared but a copy of the fixture recap is annexed as Exhibit A.

5.     The "fixture recap" provides, among other terms, for "English law to apply" and furthermore provides:

> "Otherwise as per C/P proforma MV 'Lucky Rose' C/P 21st December 2005 logically amended in accordance with the main terms and with the following changes . . ." (Exhibit A, page 2)

6.     The C/P proforma MV "Lucky Rose", a copy of which is annexed as Exhibit B, in Rider Clause 49, Arbitration, provides as follows:

"This Charter Party shall be governed by and construed in accordance with US law. Any dispute arising out of or in connection with this Charter Party or Bills Lading issued hereunder, shall be referred to arbitration in New York with SMA. The dispute to be settled by a single arbitrator who is to be appointed by the parties hereto. If the parties cannot agree upon the appointment of an arbitrator, the dispute shall be settled by three arbitrators, each party appointing one arbitrator, the third being appointed by the two so chosen. If the arbitrators fail to agree on the appointment of the third arbitrator, such appointment shall be made by the Society of Maritime Arbitrators (SMA).

If either of the appointed arbitrators refuses or is incapable of acting, the party who appointed him shall appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator, either originally or by way of substitution, the Society of Maritime Arbitrators (SMA) shall, after application from the party having appointed his arbitrator, also appoint an arbitrator on behalf of the party in default.

Disputes involving amounts less that USD 50,000 shall be settled according to the Small Claims Procedure.

7.      The M/V Orla was duly tendered by Petition to Respondent in accordance with the terms and conditions of the charter party and loaded a cargo of rice at Freeport, Texas. Thereafter the vessel proceeded to Cuba where discharge of the cargo was completed.

8.      Disputes have arisen, under the terms of the charter party, for hire paid but not earned and other claims in the amount of $118,777.22, by Respondent against Petitioner, and Petitioner's claims against Respondent for layberth and towage expense in the amount of $22,955.52.

9.      On April 17, 2008, Respondent appointed as its arbitrator Mr. Alexis Nichols, advised respondent of Mr. Nichol's appointment and requested that petitioner name its arbitrator and proceed to arbitration in New York (Exhibit C).

6338943.2

10.    Petitioner, in a letter dated April 29, 2008, informed Respondent that a "hard copy" of the M/V Orla was not prepared and that, in view of the parties' agreement, English Law was to apply, the arbitration clause, Clause 49, should have been logically amended to provide for English arbitration (Exhibit D).

11.    Petitioner requests that the Court compel Respondent to proceed to arbitration in London in accordance with the fixture recap as logically amended by the pro forma "Lucky Rose" C/P dated 21 December 2005 and stay the arbitration proceedings commenced by Respondent in New York.

12.    In that Respondent's failure to comply with the agreement of the parties to provide for arbitration in London has necessitated the making of this application, Petitioner requests that it be awarded the costs and attorneys' fees incurred in making this petition.

13.    The Petitioner has duly performed all its obligations to the Respondent in accordance with the terms of the governing charter party and the parties' agreement.

14.    No previous application has been made to this Court, or any other Court or Judge, for the order and relief sought herein.

WHEREFORE, Petitioner prays that in accordance with the provisions of the Federal Arbitration Act, this Honorable Court enter an order:

(1)    Directing that Respondent proceed with arbitration in London in accordance with the parties' fixture recap agreement and relevant clauses of the

governing charter party, as modified by the logical amendments to the pro forma "Lucky Rose" C/P dated 21 December 2005.

    (2)    That petitioner be awarded the costs and attorneys' fees for this petition and such other and further or different relief as the Court may deem just and proper.

Dated: New York, New York
       June 12, 2008

             Carter Ledyard & Milburn LLP
             Attorneys for Petitioner Polsteam Shipping
             Company, Limited

             By: _____
                 Donald J. Kennedy
                 Two Wall Street
                 New York, New York  10005
                 Tel. (212) 238-8707
                 Fax: (212) 732-3232

<u>VERIFICATION</u>

STATE OF NEW YORK      )
                                         : ss.:
COUNTY OF NEW YORK    )

Donald J. Kennedy, being duly sworn, deposes and says:

I am a member of the firm of Carter Ledyard & Milburn LLP, attorneys for petitioner, Polsteam Shipping Company Limited. I have read the foregoing amended petition and know the contents thereof and the same is true to the best of my knowledge, except as to the matters therein stated to be on information and belief, and as to those matters I believe them to be true.

The sources of my information and the grounds of my belief are statements and records furnished me by the petitioner, its officers and agents.

The reason this verification is not made by petitioner is that it is a corporation, none of whose officers is now within this district.

_____
Donald J. Kennedy

Sworn to before me this
12 day of June, 2008

_____
Notary Public

MARITZA LEON
Notary Public, State of New York
No. 01LE6003817
Qualified in Nassau County
Commission Expires March 9, 2010

6338943.2

6

# EXHIBIT A

**Temat:** [Chartering] mv Orla / Caytrans - recap of clean fixture
**Nadawca:** <broker@polsteamusa.com>
**Data:** Mon, 19 Mar 2007 15:18:22 -0400
**Adresat:** "CHARTERING \(CHARTERING\)" <chartering@polsteam.com.pl>

KP. 8434

Marek / Robert

Thks vm for fixture

RECAP OF CLEAN FIXTURE WITH ALL SUBS IN ORDER

C/P DD 19TH MARCH 2007

Acct: Caytrans Project Services ltd, New Orleans, la

M/V 'ORLA'
GRD/SD/SELFTRIM/BLT 99
FLAG/CREW  MALTESE/POLISH
17,059 MTS DWAT ON 8.55 M SSW
TPC 29.7
INT'L GRT/NRT 11,848/5,452
PANAMA  9,967
SUEZ GRT/NRT 12,410.32/10,260.83
L/B  149.47 / 22.99 M
HO/HA 4 BOX SHAPED /4
HA DIMS (L X B): 1) 19.2 X 10.6 M  2-4) 19.2 X 19.0 M HA CVRS: FOLDING TYPE,
HYDRAULICALLY OPERATED, KVAERNER TT STRENGTH: 1-4) 13.5 MTS/SQM
2 CR X 25 MTS (RADIUS 3-22 M), no grabs on board
TTL GRN CAPA 750,790 CBFT
B/DOWN BY HO:
1) 155,456    2) 195,925    3) 201,753    4) 197,656
S/C (IN GOOD WEATHER CONDITIONS UPTO/INC BEAUFORT WIND SCALE 3 AND DOUGLAS
SEA STATE 3, NO ADVERSE CURRENT, NO NEGATIVE INFLUENCE OF SWELL):
B/L AV 13.5 KN ON 21.5 IFO + 0.05 MT MDO
P                        2.5 IFO + 0.5 MDO GEAR IDLE
                         3.8 IFO + 0.5 MDO GEAR WORKING VSL MAY BURN MDO WHEN
MANOUVRING IN NARROW WATERS/PORTS/CANALS BUNKERS QUALITY STANDARDS:
IFO380CST - ISO RMG 35, MDO - ISO DMB IF WEATHER CONDITIONS ARE WORSE THEN
BEAUFORT 3 AND/OR DOUGLAS 3 SCALE THEN VESSEL'S ACHIEVED PARAMETERS CANNOT
BE CLAIMED

- OWNERS: POLSTEAM SHIPPING COMPANY LIMITED, LIMASSOL, CYPRUS
  AS DISPONENT OWNERS
- CLASS: LLOYD'S

All DETS "ABOUT"

Masters stowplan bss milled rice stowing 44'

stowplan:
h1 - 3590 mt full
h2 - 3438 mt slack
h3 - 4658 mt full
h4 - 4564 mt full
ttl = 16250 mt

Master confirm no strapping bagging securing required

- last 3 cargoes: steel prods/ferts/wheat
- nationality of officers/crew: polish

- Owners provided ISM DOC ISPS and PandI club entry as part of subjects

- tct one laden leg via USG with us gov licencenced cgo of milled rice in
bulk chopt option 2nd laden leg in direct continuation. option to be
declared latest prior arrival Cuba.

- trading always via safe port(s)/safe berth(s)/always afloat.

- Delivery: dop Houston atdnshinc

- Redelivery: dop 1 sp Cuba atdnshinc

- 1st load port will be Freeport TX

- l/c mar 24 - 30 March 2007

- Vessel to be ready standard grain clean. Any additional cleaning/
inspections required due to the nature of cargo to be for Charterers'
account/time and vessel not to be off-hired if vessel is rejected due to
that fact.

- duration about 25days if 1 laden leg. About 50days if 2 laden legs

- hire us$ 21,000 day prorata payable 15days in advance less commission
only. 1st hire including estimated bunker consumption to be paid on vessel's
delivery

- Bunkers.
Bunkers on dely: abt 495 mt IFO/abt 20 mt MDO. Charts to pay for estimated
bunker consumption on vessel's delivery.
Bunkers on redely: as on board
Prices both ends: USD 300 pmt IFO, USD 550 pmt MDO.
Owners have the right to bunker prior redelivery for their own acct provided
same does not interfere with Charts operations.

- cve: 1250/month pr

- ilohc 2500 ls excluding removal of dunnage and fittins, if any, which to
be done by Charts at their time/risk/expenses

- INTERMEDIATE HOLD CLEANING
WEATHER, TIME AND SHORE LABOUR/REGULATIONS PERMITTING, CHRTRS TO
HAVE THE OPTION OF CREW CLEANING VSLS HOLDS. SUCH CLEANING TO BE
PERFORMED IN ACCORDANCE WITH BEST SEAMANSHIP BUT WITHOUT G'TEE TO
OBTAIN USDA/NCB OR EQUIVALENT CERTIFICATES.
INTERMEDIATE HOLDS CLEANING NOT TO INCLUDE REMOVAL OF DUNNAGE AND
FITTINGS, WHICH TO BE DONE BY CHRTRS AT THEIR TIME/RISK/EXPENSE.
CHRTRS TO PAY LMPS USD 2500.
THE LUMPSUM PAYMENT TO COVER LABOUR COSTS ONLY. ANY CHEMICALS
AND/OR FRESH WATER, IF REQUIRED FOR CLEANING, TO BE
PROVIDED BY CHRTRS FOR THEIR ACCNT.

- cargo exclusions
cargo to be harmless, non dangerous, no IMDG classed, loaded in accordance
with IMO regulations. Cargo to be always us gov licensed.
All cargoes excluded except lawful grains in bulk always excluding sunflower
seeds/expellers and rice but incl milled rice in bulk.

- Trading exclusions:
All countries excluded except: USA, Cuba.

- English law to apply

BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International
Code for the Security of Ships and of Port Facilities and the relevant
amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and
"the Company" (as defined by the ISPS Code). If trading to or from the
United States or passing through United States waters, the Owners shall also
comply with the requirements of the US Maritime Transportation Security Act
2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the
relevant International Ship Security Certificate (or the Interim
International Ship Security Certificate) and the full style contact details

of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

BIMCO U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)   Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and

iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

- 2.50pct addcomm

- Otherwise as per C/P proforma mv "Lucky Rose" c/p 21st December 2005 logicaly amended in accordance with main terms and with following changes

Line 78: del "and direction"
Line 79: del "and Tally Clerk's"
Line 90: del "The vessel has natural ventilation only"
Line 101: after "extra" insert "directly related"
Line 116: del "1990 and any amendments thereafter" and in this place insert "1994"
Line 142: del "sufficient"

Rider clauses

Cl.37: reverting with Owners bankers
Cl.38, line 5: del "all direct expenses and"
Cl.41: as per main terms
Cl.42: as per main terms
Cl.44: as per main terms
Cl.50: as per main terms
Cl.51: as per main terms
Cl.52: del "1993" and insert "2004"
Cl.61: to remain as per proforma except that two persons from Charterers are to sign.
Cl.65: del all
Cl.66: del all
Replace CONWARTIME 1993 with CONWARTIME 2004 Addendum Number 1: del all

Add BIMCO Stowaways Clause for Time Charters

End recap

Thks vm for support.

Regards
Robert Kapsa

While replying please use e-mail: chartering@polsteamusa.com

_____

chartering mailing list
chartering@polsteam.com
http://manat.polsteam.com/cgi-bin/mailman/listinfo/chartering

20/02/2007 07:51

# EXHIBIT B





**Original**

# Time Charter
GOVERNMENT FORM
*November 6th, 1913 · Approved by the New York Produce Exchange*
*Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946*

1 This Charter Party, made and concluded in ...Scarsdale, New York................................. 21ˢᵗ day of December................. 19 2005

2 Between ..NORTH POLE NAVIGATION ........................................................................................................

3 Owners of the good ...Maltese flag........................ Steamship/Motorship "LUCKY ROSE" - See Clause 29 ................. of .........

4 of ................. tons gross register, and ................. tons net register, having engines of ................................. indicated horse power

5 and with hull, **cargo spaces** machinery and equipment in a thoroughly efficient state, and classed ................................

6 at ................. of about ...... ...... cubic bale capacity, and about ........ 26,272 metric, .................... tons of 2240 lbs.

7 deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8 allowing a minimum of fifty tons) on a draft of ..9.75 meters feet ...... inches on .......................................................

9 which are of the capacity of about ...................................................... Summer freeboard, inclusive of permanent bunkers, which

**the Charter, fully laden, under good weather** .................... tons of fuel, and capable of steaming **throughout the duration of**

10 conditions about 13 knots on a consumption of about 25 ...tons of **IFO + 2.8 MTS MDO at sea + 1.5 MTS idle MDO at port** best Welsh coal best grade fuel oil best grade Diesel oil,

11 now **trading,** ...............................................................................................................

12 ...................................................................... and Caytrans Project Services

13        Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 r ...................................................................................................................

15 ...................................................................................................................

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party.

18 Vessel to be placed at the disposal of the Charterers, at **in direct continuation after 2ⁿᵈ voyage with the charter party dated 06 December**

19 **2005 anytime day or night Sundays and holidays included**..................................................................

20 in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5, Vessel on her delivery to be

22 ready **and fit in every way to receive and carry cargo allowed under this Charter Party** spaces clean, dry and loose rust scale

**free** which a condition to receive cargo with clean swept tanks and tight, staunch, strong and in every way fitted for the service **and so maintained**

23 **by the Owners throughout the duration of this Charter** having water ballast, winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

24 time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 dise, including petroleum or its products, in proper containers, excluding **See Clause 51** ...........................................

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirement to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America, ...... and/or Europe and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic,

32 **timecharter period duration 7-9 months +/- 15 days in Charterers' option with 21 days redelivery notice via good safe**

33 **port(s)/berth(s)/anchorage(s) always within Institute Warranty Limits from U.S. Gulf to Cuba only, always afloat always**

34 **accessible basis, with U.S.A. government licensed grain cargo except dangerous grains. See also Clause 65**

35 as the Charterers or their Agents shall direct, on the following conditions:

36       1. That the Owners shall provide and pay for all lubricating oil and fresh water provisions, wages and consular shipping and discharging ices of the Crew, shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38 the vessel in a thoroughly efficient state in hull, **cargo spaces** machinery and equipment for and during the service.

39       2. That whilst on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, Pilotages, Agencies,

Commissions, Taxes, Dues, Wharfages on freight, hire, vessel, cargo. If any compulsory watchmen(s)/canal and/or river expenses including canal/river pilotages/tugboats dues/tariffs, mooring man/lineman, projector man etc. and other

 

expenses related with canal/river transit.

40 Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into

41 a port for causes for which vessel is responsible, then all such charge incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports **under Charterers orders** visited while vessel ~~is employed under this~~

43 ~~charter~~ to be for Charterers account ~~All other fumigations to be for Charterers account after vessel has been on charter for a continuous period~~

44 ~~of six months or more.~~

45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46 Owners to allow them the use of any dunnage, and shifting boards **as on board** already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48 3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ~~_____ tons and not more than~~

50 ~~_____ tons and to be re-delivered with not less than _____ tons and not more than _____ tons.~~ **See Clause 44**

51 4 That the Charterers shall pay for the use and hire of the said Vessel at the rate of **$10,475.00 per day/pro rata including overtime payable 15 (FIFTEEN) days in advance to the owners nominated bank account**

52 _____ United States Currency ~~per ton on vessels total deadweight carrying capacity, including bunkers and~~

53 ~~stores, on~~ _____ summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid and at

54 and after the same rate for any part of a month, hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at **on dropping last outward sea pilot one safe port Caribbean any time day or night Sundays Holidays included.**

56 unless otherwise mutually agreed, Charterers are to give Owners not less than 15/10/5/3/2/1 approximate days

57 notice of vessels expected date of re-delivery, and probable port.

58 5 Payment of said hire to be made **see clause 37** in ~~New York~~ in cash in United States Currency. **15 days** semi-monthly in advance, and for the last 15 days ~~last half month~~ in

59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

66 to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

67 of such advances.

68 6. That the cargo or cargoes be laden and/or discharged in any safe dock or at any safe wharf and/or safe place that Charterers or their Agents may

69 direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70 ~~lie aground.~~

71 7. That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also

72 accommodations for Supercargo, if carried, shall be at the Charterer's disposal, reserving only proper and sufficient space for Ships officers, crew,

73 tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74 ~~paying Owners _____ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

75 ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~

76 8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78 agency; and Charterers are to load, **dunnage / secure / lash** stow, and trim, **trim, undunnage / unsecure / unlash / discharge** the cargo at their

79 expense under the supervision and direction of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's **and Tally Clerk's** receipts.

80 9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82 10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel at **his own risk and after signing a relevant Letter of Indemnity** and see that voyages are prosecuted

83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84 rate of $20.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, in victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying on the current rate or meal, for all such victualing **USD 1,250.00 lumpsum per month / pro**




rata including cables victualling and entertainment. If Charterers would like to appoint a supercargo then the relevant Letter of Indemnity will be sent to the Owners before the supercargo appointment checking.

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
89  sumption of fuel

90  12. That the Captain shall use diligence in caring for the ventilation of the cargo. **The Vessel has natural ventilation only.**  ←  **?**

91  13. ~~That the Charterers shall have the option of continuing this charter for a further period of~~ .....................................................................
92  .....................................................................................................................................................................................................
93  ~~on giving written notice thereof to the Owners or their Agents~~ ..... ~~days previous to the expiration of the first-named term, or any declared option.~~

94  14. ~~That if required by Charterers, time not to commence before~~ ....................................................... ~~and should vessel~~
95  ~~not have given written notice on or before~~ ..................... ~~but not later than  4 p.m. Charterers or~~
96  ~~their Agents to have the option of cancelling this Charter at any time not later than the day of vessels readiness.~~ **In direct continuation of current employment.**

97  15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  preventing **wholly or partly** the full working of the vessel, the payment of hire shall cease for the time thereby **actually lost fully or pro rata; and**
    if upon the voyage the speed be reduced by
100  defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101  thereof, and all extra **expenses** shall be deducted from the hire.

*related*

102  16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103  returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104  Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105  The vessel shall have the liberty to sail with or without pilots, to tow and to be towed , to assist vessels in distress, and to deviate for the
106  purpose of saving life and property.

107  17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108  ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109  ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ **See clause 49**

110  18. That the Owners shall have a lien upon all cargoes, and all sub-freights **sub-hires** for any amounts due under this Charter, including General Aver-
111  age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and no earned, and any overpaid hire or excess
112  deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents which
113  might have priority over the title and interest of the owners in the vessel.

114  19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and

*change*

115  Crews proportion General Average shall be adjusted, stated and settled **in New York and US law to apply.** ~~according to Rules 1 to 15, inclusive,~~
    ~~17 to 22, inclusive, and Rule F of~~ **1994.**
116  ~~York-Antwerp Rules 1990 and any amendments thereafter~~ ~~1924, at such part or place in the United States as may be selected by the carrier,~~
    ~~and as to matters not provided for by these~~
117  ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118  ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122  ~~required, be made by the goods, shipper, consignees or owners of the goods in the carrier before delivery. Such deposit shall, at the option of the~~
123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125  ~~United States money.~~ **Hire and bunkers not to contribute to general average See Clause 49.**
126  ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128  ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~

132  Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133  20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
134  cost of replacing same, to be allowed by Owners.

135  21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~




136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 **Vessel not to drydock during this Charter except in case of emergency.** ...........................
139 ...........................

140     22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts **as per vessel's description**
~~up to three tons,~~ also

141 providing ropes, falls, slings and blocks **If and as on board** If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide
necessary gear for

142 same, otherwise equipment and gear for heavier lifts shall be for Charterers account. Owners also to provide on the vessel **sufficient light for
each hatch as on board** ~~lanterns and oil~~ for

143 night work, and vessel is to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers expense. The
144 Charterers to have the use of any gear on board the vessel.

145     23. Vessel to work night and day, if required by Charterers, **Saturdays, Sundays and holidays included** and all winches to be at
Charterers' disposal during loading and discharging; but if any gangway/watchmen are compulsory same will be provided and paid by the
Charterers (due to working at night, gangway or watchmen at some ports are compulsory because of the port regulations).

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ships articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Watchmen to be paid by Charterers, in the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss time occasioned~~
150 ~~thereby.~~

151     ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading, issued hereunder:~~

155                     U.S.A. Clause Paramount
156 This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158 any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading
159 be repugnant to said Act to any extent, such term shall be void to that extent, but no further

160                     Both-to-Blame Collision Clause
161 If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162 Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried
163 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165 carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166 owners as part of their claim against the carrying ship or carrier.

167     25. ~~The vessel shall not be required to enter any ice-bound port, or any port where lights or light ships have been or are about to be with-~~
168 ~~drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the~~
169 ~~port or to get out after having completed loading or discharging.~~ See clause 60.

170     26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, **acts of pilots and tugboats**, insurance, crew, and all other matters, same as when trading for their own account.

172     27. A commission of 2½ **1.25** per cent is payable by the Vessel and Owners to **EKS INTERNATIONAL LLC**
173 ...........................

174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter

175     28. An address commission of 2½ per cent payable to .. **the Charterers** ............. on the hire earned and paid under this Charter
**Rider Clauses 29 through 66 inclusive, as attached, are deemed to be fully incorporated in this Charter Party.**

It is precise copy of the original document which can be modified, amended or added to only by the striking out of original charterers,
or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as
having been made by the licensee or end user as appropriate and not by the author

For Owners .............................     **North Pole Navigation Co. Ltd,**                   For Charterers

AKTİF
DENİZCİLİK
BİLGİSAYAR FORM MÜMESSİLLİK
SANAYİ VE TİCARET A.Ş.




**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

### 29. VESSEL'S DESCRIPTION

Owners warrant that the date of delivery and throughout the duration of this Charter Party, the vessel will conform in all respects with the description set forth hereunder.

MV "LUCKY ROSE"
- BUILT 1978
- DWT 26272
- DRAFT 9.75 SW
- SD BC
- CRANE(S) 5 X 16 TNS
- INTL GRT/NRT 16.704/10.110MT
- LOA/BEAM 173,159M/26.6M
- MALTESE FLAG
- PANDI CLUB :       UK CLUB LONDON
- 5 H/H
- GR/BALE CAP 1204238 CBFT / 1133716 CBFT
- SPEED/CONSUMPTION:
  BALLAST ON 13 KNOT / ABT 25 MT/DAY IFO
  LADEN ON 13 KNOT/ABT 25 MT/DAY IFO AT 180 CST
  MDO AT PORT:  IDLE 1.5MT – DAY AT SEA: 2.8MT – DAY
  GEARWORKING 3MT-DAY
  BUNKER DESCRIPTION:
  IFO: ISO 8217 RME – 25 180 CST
  MDO: ISO 8217 DMB DISTILLATED
  All figure(s) are "about"

### 30. ON / OFF HIRE SURVEY

Owners and Charterers are to hold a joint on-hire and off-hire survey at first load respectively last discharge port.
The Owners to bear all expenses of the on-hire survey including loss of time only if loading operations are interrupted due to such a survey. Furthermore, Owners have the right to appoint the Master or a Chief Engineer as their representative in which case no expenses applies for the Owners. The Charterers to bear all expenses of the off-hire survey, including loss of time, if any, at the rate of hire per day or pro rata, unless the Owners have already taken use of the vessel.
Owners guarantee that vessel's hatch covers are watertight and will be maintained so throughout the duration of the Charter.

### 31. BALLAST VOYAGES

Owners guarantee vessel to be always safe in ballast without requiring solid ballast.

### 32. BILLS OF LADING

The Master is to sign Bills of Lading as presented in strict conformity with mate's receipt for all cargoes carried under this Charter Party if required by Charterers without prejudice to the terms and conditions of the Charter Party.

1




**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

Charterers to be authorized by the Master to issue and sign such Bills of Lading but only in strict accordance with mate's receipt. No Waybils, no Liner nor Through Bills of Lading to be issued.

## 33. STEVEDORE DAMAGE / DAMAGE TO HULL OR MACHINERY

Notwithstanding anything contained herein to the contrary the Charterers shall pay for any and all damage to the vessel caused by Stevedores provided the Master has notified the Charterers' and/or their Agents in writing as soon as practical but not later than 24 hours after any damage is discovered but prior to sailing port except for hidden damages. Master to attempt to get responsible party or acknowledge damage in writing. In case of any and all damage(s) affecting the vessel's seaworthiness, cargoworthiness and/or the safety of the crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense/time and the vessel is to remain on hire until such repairs are completed and passed by the vessel's classification society.
Any and all damage(s) not described under point a above shall be repaired after redelivery concurrently with owners' works. In such case no hire and/or expenses will be paid to the owners except insofar as the time and/or the expense required for the repairs for which the charterers are responsible exceed the time and/or expenses necessary to carry out the owners' works.

## 34. CREW ASSISTANCE

Timecharter hire to include rendering customary assistance by the crew including, opening and closing of hatches, shifting operations and docking, bunkering, supervising cargo operations etc.
The timecharter hire is inclusive of all overtime work done by Master, officers and crew.
Above services to be rendered providing port regulations permit.

## 35. CHARTERERS' MARKINGS

Deleted.

## 36. CHANGE OF FLAG

Owners are not allowed to change vessel's flag or substitute vessel during the currency of this Charter without obtaining Charterers' prior approval.

## 37. PAYMENT OF HIRE

Payment of hire to be made to:

| | | |
|---|---|---|
| ACCOUNT NAME | : | NORTH POLE NAVIGATION |
| ACCOUNT NO | : | 410.00.02.548 (USD) |
| BANK | : | THE ECONOMY BANK N.V. |
| | | PROF. W.H. KEESOMLAAN 5 |
| | | 1183DJ AMSTELVEEN |
| | | THE NETHERLANDS |

2




**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

SWIFT                    :        TEBUNL2A

CORRESPONDING BANK (USD):
BANK OF NEW YORK, N.Y.
ACCOUNT NO          :        8900386169
SWIFT                    :        IRVTUS3N

Further to clause 5. Where there is failure to make 'punctual and regular payment' including first hire payment, due to weekends or omissions of Charterers' employees, bankers, agents, where there is absence of intention to fail in making payment as set out, Charterers shall be given by Owners two banking days to rectify the failure and where so rectified, the payment shall stand as punctual and regular payment.

**38. SUSPENSION OF HIRE**

Further to clause 15, it is agreed that in case hire is suspended for any reason as mentioned in clause 15, or elsewhere in this Charter Party, hire shall remain suspended fully or pro rata until vessel is again in the same position or an equidistant position in relation to her destination as when hire was suspended, and all direct consequential losses suffered ~~and all direct expenses~~ and all direct proven expenses incurred during such period, including bunkers consumed, shall be for the Owners' account.

In the event of breakdown, fully or partly, of cargo gear by reason of disablement or insufficient power, the full hire shall cease to count fully or pro rata for time actually lost. The Owners will only employ shore gear if crane(s) damaged is not rectified within maximum 8 hours. However, also agreed that during the hours included but limited to maximum 8 hours the hire will be suspended proportionally.

In the event of loss of time due to blockade or boycott of the vessel in any port or place by shore labour or others (whether arising from Government restrictions or not) by reason of the ownership / management / operation or control; the terms and conditions on which the members of the crew are employed; the trading of the vessel since she was built; the trading of any other vessel under the same ownership / management / operation or control; any alleged physical or documentary deficiency in relation to the vessel's safety or cargo gear; or by any other reason which relates to the Owners, payment of hire shall cease for the time thereby lost and all direct expenses and other direct consequences to be for Owners' account. But in the event of loss of time due to strikes/boycotts of the labors or any other related parties at the ports not by the reason of the vessel/ownership/management then, time to count and the vessel will be on hire.

Any delay, expenses or fines incurred on account of smuggling, if caused by the officers and crew, to be for Owners' account.
Charterers have the option of adding any or all off-hire periods to the duration of the Charter and vice versa if caused by charterers' / charterers' employees to be for charterers' account. U.S. Anti Drug Abuse Act 1986 Clause will be applied.

**39. DEVIATION**

Should the vessel be put into a port for causes for which vessel is responsible except for reasons as stipulated in cl.19, all such charges incurred thereto, shall be paid for

3





### RIDER TO
### M/V "LUCKY ROSE"
### <u>CHARTER PARTY DATED DECEMBER 21, 2005</u>

by Owners and the hire shall be suspended from the time of her putting back until she is again in the same position and voyage resumed therefrom, unless otherwise agreed.

### 40. DEDUCTIONS FROM HIRE

Charterers have the right to withhold from charter hire such amounts due to them for undisputed off-hire and for Owners' disbursements but max USD 500, advances, or other amounts which undisputable are to be for Owners' account, on basis of a reasonable estimation. However, final accounting to be arranged by Charterers as promptly as possible but maximum within ten days after redelivery, and Charterers to produce supporting evidence for such deductions but max. 500 US$ per port.

Should the vessel be on her voyage towards the port of redelivery at a time a payment of hire becomes due, said payment shall be made for such length of time as Charterers or their agents may consider to be the estimated time necessary to complete the voyage, which not to be unreasonably withheld, less estimated disbursements arranged by the Charterers for Owners' account, and when vessel is redelivered to Owners or their agents, any difference shall be refunded by Owners or shall be paid by the Charterers, as the case may require.

### 41. SPEED & CONSUMPTION

Owners warrant that, throughout the duration of the charter, the vessel will be capable of maintaining an average speed of 13 knots, on a consumption of about 25 mt per day IFO, laden on 13 knots about 25 mt per day IFO at 180 cst MDO at port: idle 1.5 mt – day at sea: 2.8 mt – day – gear working 3 mt – day - bunker description: IFO: iso 8217 rme – 25 180 cst – MDO: iso 8217 dmb distillated.
The vessel's speed capability is to be calculated on basis of the vessel's log extracts or voyage reports (unless manifestly incorrect) and by an independent weather bureau reports. In case of consistent discrepancy between log books and the independent routiner's company's reports, unless a mutual solution is found, the case to be referred to arbitration.
Set-off shall be allowed for saved bunkers, if any, against Charterers possible claim for speed deficiency.

### 42. REDELIVERY – INTERMEDIATE HOLD CLEANING

Charterers have the option to redeliver the vessel unclean against paying a total of USD 2,500.00 / USD 500.00 per hold actually cleaned.

### 43. ARREST / DETENTION

Should the vessel be arrested or detained during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire shall not be payable in respect of any period whilst the vessel remains under arrest / detention or remains unemployed as the result of such arrest / detention, and the Owners shall reimburse the Charterers any direct losses suffered or direct expenses incurred as a result hereof. It is understood that during such arrest if the vessel's operations are not interrupted the vessel is to be fully on-hire.

4

 

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

Owners realize that USCG has placed vessel on "high interest" status as a result of crew situation, desertions and lack of visas. Owners have already taken all necessary steps to correct this situation. In the event that despite Owners best efforts, the USCG refuses entry to U.S.A. of the vessel in the coming calls due to re-occurrence of similar incidence(s) beyond Owners'/Masters' control, then Charterers agree to cancel balance of charter without penalty to Owners.

**44. BUNKERS**

Charterers will use their bunkers that had been supplied at New Orleans, bunker quantities on redelivery to be minimum 170 metric tons IFO and 65 metric tons MDO. If Charterers use Owners' bunkers on board the vessel then they will pay to Owners the bunkers they consumed at U.S $300.00 for IFO and U.S. $600.00 for MDO.

Owners are allowed to bunker the vessel for their own account at the port prior to re-delivery provided it does not interfere with the Charterers' operation or cargo intake.

**45. AGENCY**

Owners are entitled to appoint their own agents at any port or to use the agents appointed by Charterers against payment / reimbursement of any fee charged by the agents which relate to Owners' business. Charterers shall not be responsible for any act or omission by the agents in this relation.

**46. GARBAGE**

Garbage removal expenses and excise duty to be for Owners' account, except those pertaining to the cargo. Compulsory garbage removal to be for Charterers' account.

**47. CERTIFICATES**

The vessel to have valid cargo gear certificates for the duration of the Charter, and vessel to comply with any safety regulations and / or requirements in effect at any port within the trading limits.
Vessel to have on board all certificates necessary to operate in any port within the trading limits. Owners to pay all consequential losses including loss of time resulting from their failure to comply with the aforementioned.

Charterers to guarantee that the vessel will not be restricted or delayed in any way upon returning to USA as a result of carrying this cargo to Cuba.

Charterers will furnish a copy of "D" License issued by the United States department of Commerce; Bureau of Industry and Security to Owners on fixing main terms. Charterers also to furnish a copy to Master at loading port.

Owners P&I Club Letter of Indemnity for non presentation of Bills of Lading at discharge port to be signed only by Charterers not bankers/receivers.

5




**RIDER TO
M/V "LUCKY ROSE"
CHARTER PARTY DATED DECEMBER 21, 2005**

**48. RETURN PREMIUMS**

Deleted.

**49. ARBITRATION**

This Charter Party shall be governed by and construed in accordance with US Law.
Any dispute arising out of or in connection with this Charter Party or Bills Lading
issued hereunder, shall be referred to arbitration in New York with SMA. The dispute
to be settled by a single arbitrator who is to be appointed by the parties hereto. If the
parties cannot agree upon the appointment of an arbitrator, the dispute shall be
settled by three arbitrators, each party appointing one arbitrator, the third being
appointed by the two so chosen. If the arbitrators fail to agree on the appointment of
the third arbitrator, such appointment shall be made by the Society of Maritime
Arbitrators (SMA).
If either of the appointed arbitrators refuses or is incapable of acting, the party who
appointed him shall appoint a new arbitrator in his place.
If one party fails to appoint an arbitrator, either originally or by way of substitution, the
Society of Maritime Arbitrators (SMA) shall, after application from the party having
appointed his arbitrator, also appoint an arbitrator on behalf of the party in default.

Disputes involving amounts less that USD 50,000 shall be settled according    to the
Small Claims Procedure.

**50. TRADING LIMITS**

Vessel To Trade Always Within lwl Excluding: Sweden, Norway, Finland, Denmark,
Iceland, USA, Canada, Cuba, Haiti, Algeria, Libya, Syria, Lebanon, Iran, Iraq, Toc,
Albania, Yugoslavia, Sea Of Azov, Georgia, Magellan / Cape Horn, Jordan, Nigeria,
Angola, Somalia, Sudan, Israel, Yemen, Ethiopia, Eritrea, Liberia, Ghana, Zaire,
Guinea, Congo, Gambia, Gabon, Guinea Bissau, Togo, Sierra Leone, Senegal, Ivory
Coast, Benin, Cameroon, Nicaragua, St. Salvador, Amazon, Australia, New Zealand,
Indonesia, North Korea, Cambodia, Vietnam, Cis Pacific  Ports, S, Myanmar, War
And Warlike Zones.
Vessel neither to follow an ice braker nor to force ice.
Vessel is not allowed to sail / trade directly between P.R. China and Taiwan and vice
versa.

**51. CARGOES ALLOWED**

Corn allowed ~~only~~. No deck cargo allowed.

Owners/Master to confirm the vessel can load about 25,000 mt bulk corn with
maximum stowage factor 48 or about 25,000 mt bulk wheat with maximum stowage
of 48 cubic feet however as to loadable quantities Charterers to reconfirm with
Master, as they did before, the exact quantities based on the type of cargo and the
maximum stow factors given.

**52. WAR RISK INSURANCE**

Conwartime Clause ~~1993~~ 2004 to apply.

6




## RIDER TO
## M/V "LUCKY ROSE"
## CHARTER PARTY DATED DECEMBER 21, 2005

If any additional war risk insurance premium to be for Charterers' account.

**53.**

If any extra overage insurance premium due to vessel's age to be for Charterers' account.

**54.**
Delete.

**55.**

Deleted.

**56.**

Deleted.

**57.    BIMCO STANDARD ISM CLAUSE FOR VOYAGE AND**
**TIME CHARTERPARTIES**

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

**58. CREW SERVICES**

Hire to include the following services from crew:
1.    Shifting and warping vessel during loading and / or discharging alongside the berth or from one berth to another.
2.    Bunkering.
3.    Raising and lowering derricks or rigging cranes and preparation for loading and discharging.
4.    Opening and closing of hatches in preparation for and during loading and / or discharging. Officers and crew to shape up vessel's hatches and derricks or cranes as much as possible as far as weather permits prior to vessel's arrival at loading and / or discharging port.
5.    Removing and replacing beams in preparation of loading and discharging.
6.    Supervision of loading and / or discharging.
7.    Crew including one (1) officer supervising cargo operations on deck during loading and discharging.
8.    It is understood that if any of the above services are prohibited by shore regulations same to be provided by Charterers. However, crew will do

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

their best to perform applicable services while at sea provided same does not affect vessel's seaworthiness.

The services of the crew do not include the securing and lashing of containers, neither the securing lashing and / or strapping of bulk cargo if there is empty space or cargo slack on holds and always provided that weather permits.

**59. HIRE TO BE PAID TO:**

Deleted.

**60. ICE CLAUSE**

Deleted.

**61. LOI CLAUSE**



In case original bills of lading are not available at the port/s of discharge, Owners agree to discharge / release the cargo against a letter of indemnity (LOI) in Owners, P & I Club standard wording (as given below), signed by Charterers and also receivers if same obtainable.

LOI to be drawn on Charterers' headed paper and to be signed by Charterers' designated person showing full name and place in the company. LOI to be faxed to Owners for approval and original one to be mailed as soon as possible.

**62. PRE-LOADING CARGO SURVEY CLAUSE**

Deleted.

**63. HAMBURG RULES CHARTER PARTY CLAUSE**

Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague / Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

**64. INTERCLUB AGREEMENT**

Notwithstanding any provision to the contrary contained in this Charter Party, cargo claims, if any, are to be settled in accordance with the Interclub New York Produce Exchange Agreement, as amended on September 1996.

**65.**

Charterers' option to purchase the vessel during period at price to be agreed.

8

 

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

66.

*del*

During the t/c period, Owners have the right to substitute M/V "Lucky Rose" with equally (similar meaning type, intake, gear, P and I, age etc.) performing tonnage as well as to sell their vessel with t/c attached. Same to be consistent with Charterers shipment schedule.

**BIMCO Standard War Risks Clause for Time Charters, 1993**
**Code Name: "CONWARTIME 1993"**

(1)    For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master and
(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, civil commotion, warlike operations, the laying of mines ( whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and / or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, in the reasonable judgement of the Master and / or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3)    The Vessel shall not required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and / or confiscation.

(4)    (a)    The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premium and / or calls thereof shall be for their account.

9

 

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

(b)    If the Underwriters of such insurance should require payment of premiums and / or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and / or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5)    If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6)    The Vessel shall have liberty:
(a)    To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions.

(b)    To comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance.

(c)    To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement

(d)    To divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier.

(e)    To divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7)    If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.




**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

(8)    If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charterparty.


## WAR CANCELLATION CLAUSE

Either party may cancel this Charter Party on the outbreak of war or hostilities:

(a) between any two or more of the following countries, the United States of America, Russia, the United Kingdom, France and the People's Republic of China, or
(b) between .........................................


*(a) and (b) are optional, the inapplicable option should be deleted.*


## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York / Antwerp Rules, ~~1974 as amended 1990 and any subsequent amendment, if any,~~ but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply. *1994*

New Jason Clause
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery" and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.


## U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of



RIDER TO
M/V "LUCKY ROSE"
CHARTER PARTY DATED DECEMBER 21, 2005

carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)   Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**U.S. Tax Reform 1986 Clause**

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

**ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

12

 

### RIDER TO
### M/V "LUCKY ROSE"
### CHARTER PARTY DATED DECEMBER 21, 2005

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Notwithstanding any other provisions in this Clause, or any other provision in this charter party, any and all costs and delays, if any, arising from vessel's crew being Turkish to be for Owners' account.

## U.S. Anti Drug Abuse Act 1986 Clause for Time Charters

(a) In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest

 

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

(b) In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

14



Lucky Rose / Caytrans  Charter Party Dated: December 21, 2005

**Addendum  Number 1**:
Date: December 23, 2005

Owners in consideration of good cooperation, herewith, in good faith, give to Charterers the option for 9-11 months to be declared by latest vessel's arrival at discharge port with the 2nd voyage under period charter.

Owners ᴏᴎ ᴃᴇʜᴀʟꜰ ᴏꜰ        **North Pole Navigation Co.** ᴸᵀᴰ Charterers

A K T İ F
DENİZCİLİK
Bk. olo...ceerFORM MÜMESSİLLİK
SANAYİ ve TİCARET A.Ş.

# EXHIBIT C

# RICHARD A. ZIMMERMAN
## ATTORNEY AT LAW

### SUITE 2202
### 233 BROADWAY
### NEW YORK, NEW YORK 10279

TELEPHONE (212) 962 1818                    E MAIL: zimmny@attglobal.net
TELEFAX: (240) 218 6456                     WEB: richardzimmerman.com

April 17, 2008

<u>Via Facsimile</u>

Donald J. Kennedy, Esq.
CARTER LEDYARD & MILBURN LLP
2 Wall Street
New York, NY 10005-2072
Fax: (212)732-3232

                    Re:   M/V ORLA
                          C/P Dated: March 19, 2007
                          **NOTICE OF ARBITRATION**

Dear Mr. Kennedy,

        Thank you for your letter of April 2, 2008.

        For good order, please note that our client denies and
rejects the allegations contained in paragraphs 2 through 4of
your letter.  Those allegations are both factually inaccurate
and did not contribute in any way to the delay to the Vessel.
The delay was solely attributable to your client's unwarranted
withdrawal of the services of the vessel.  Our client also
denies any liability or responsibility for the layberth and
towage expenses which flow directly from your client's breach of
the C/P and were completely avoidable in any case.

        Although Caytrans' would prefer to avoid the costs and
headaches involved in arbitration, seeking instead to reach an
amicable settlement, it seems apparent that your client's
unreasonable position will preclude any settlement and force our
client to obtain an arbitration award. Please let us know if we
are mistaken in this assumption.

In the meantime, on behalf of our client Caytrans Project Services Ltd., we hereby demand arbitration pursuant to the terms of Clause 49 of the governing party, which provides as follows:

> *This Charter Party shall be governed by and construed in accordance with English law. Any dispute arising out of or in connection with this Charter Party or Bills of Lading issued hereunder, shall be referred to arbitration in New York with SMA. The dispute to be settled by a single arbitrator who is to be appointed by the parties hereto. If the parties cannot agree upon the appointment of an arbitrator, the dispute shall be settled by three arbitrators, each party appointing one arbitrator, the third being appointed by the two so chosen. If the arbitrators fail to agree on the appointment of the third arbitrator, such appointment shall be made by the Society of Maritime Arbitrators (SMA).*
>
> *If either of the appointed arbitrators refuses or is incapable of acting, the party who appointed him shall appoint a new arbitrator in his place.*
>
> *If one party fails to appoint an arbitrator, either originally or by way of substitution, the Society of Maritime Arbitrators (SMA) shall, after application from the party having appointed his arbitrator, also appoint an arbitrator on behalf of the party in default.*
>
> *Disputes involving amount less than USD 50,000 shall be settled according to the Small Claims Procedure.*

Caytrans hereby requests Polesteam's agreement to jointly nominate the following SMA arbitrator as the sole arbitrator for this dispute:

Alexis Nichols
25 Hutchinson Avenue
Scarsdale, NY 10583
Telephone: (914) 725-1007
Facsimile: (914) 725-1127
Email: AlexisNichols@aol.com

If Polesteam will not agree to Mr. Nichols acting as the sole arbitrator, then Caytrans hereby nominates Mr. Nichols as its arbitrator for a three member panel. Pursuant to Section 10 of the SMA Rules and the above quoted arbitration agreement, Caytrans calls on Polesteam to appoint its arbitrator within

twenty days of receipt of this notice, failing which Caytrans will request the SMA to appoint an arbitrator on Polesteam's behalf.

This communication is without prejudice to our client's rights.

We thank you for your courtesy in this matter.

Very truly yours,

Patrick C. Crilley
Of Counsel
Direct Telephone:  (212) 619 1919
Direct Facsimile:  (212) 214 0311
Email: lawyerny@rcn.com

CC: Mr. Alexis Nichols
    (Via Facsimile)

# EXHIBIT D

6321424.1

# CARTER LEDYARD & MILBURN LLP

*Counselors at Law*

**Donald J. Kennedy**
*Partner*
•
*Direct Dial: 212-238-8707*
*E-mail: kennedy@clm.com*

*2 Wall Street*
*New York, NY 10005-2072*
•
*Tel (212) 732-3200*
*Fax (212) 732-3232*

*701 8th Street, N.W., Suite 410*
*Washington, DC 20001-3893*
*(202) 898-1515*
•
*570 Lexington Avenue*
*New York, NY 10022-6856*
*(212) 371-2720*

April 29, 2008

**<u>VIA FACSIMILE</u>**

Patrick C. Crilley, Esq.
Richard A. Zimmerman
Attorney at Law
Suite 2202
233 Broadway
New York, New York  10279

M/V Orla
<u>C/P dated March 19, 2007</u>

Dear Mr. Crilley:

I refer to today's telephone conversation and your letter of April 17, 2008.

It is our understanding that a hard copy of the M/V Orla charter party dated March 19, 2007, was not prepared, but it was " as per C/P proforma MV "Lucky Rose" C/P 21st December 2005 logically amended in accordance with the main terms …" The M/V Orla fixture recap provided for "English law to apply".  The version of Clause 49 quoted in your letter (English law / arbitration in New York) was not part of the fixture recap.  Therefore, in view of the English law provision, it seems to me that the arbitration clause of the C/P should have been "logically amended" to provide for English arbitration.

My client does not agree to the appointment of a sole arbitrator as proposed in your letter of April 17, 2008.

In any event, I confirm that you have agreed to extend my clients time to respond to Caytran's demand for arbitration to May 15, 2008.

Very truly yours,

Donald J. Kennedy

DJK:hcu

6324346.1