UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                                             :
In the Matter of the Arbitration,                            :
                                                             :
        -Between-                                            :
                                                             :
Polsteam Shipping Company, Limited,                          :
                                                             :
                                Petitioner,                  :
                                                             :     AFFIDAVIT OF
        -And-                                                :     MAREK TKACZUK
                                                             :
Caytrans Project Services Ltd.,                              :
                                                             :     08 Civ.  5372 (DAB)
                                                             :
                                Respondent.                  :
                                                             :
-------------------------------------------------------------X


STATE OF NEW YORK       )
                        : ss.:
COUNTY OF NEW YORK      )


        Marek Tkaczuk, being duly sworn, deposes and says:


        1.      I have been a shipbroker for over 30 years and am currently employed by

Polsteam USA, Inc.   As a senior broker I was supervising the negotiations between

Caytrans Project Services Ltd. ("Charterers") and Polsteam Shipping Company Limited

("Owners") for the fixture of M.V. Orla for the carriage of rice from Freeport, Texas to

Cuba in March/April 2007. The negotiations were conducted by Mr. Robert Kapsa, a

shipbroker with 10 years experience (presently employed as shipbroker by SecCo AS,

Bergen, Norway).

2.       The negotiations between the parties were conducted primarily over the telephone and confirmed by email.  When chartering ships, it is the custom and practice that after the negotiations of terms of a charter party are completed, a "fixture recap" is prepared which contains the terms of the charter party.  In the case of the M/V Orla, a "RECAP OF CLEAN FIXTURE WITH ALL SUBS IN ORDER C/P DD 19 MARCH 2007" was prepared and is attached as Exhibit A.  A hard copy of the charter party was not prepared and this is not unusual.

3.       On March 16, 2007, while negotiating the main terms of the fixture, Owners specified in their offer that "English law to apply".  It is undisputed that Charterers accepted and agreed that English law would apply to the charter.  The designation of "English law to apply" was a "main" term and not a "detail".  In addition, the March 16, 2007 recap also stipulated:

> "sub further terms/details as per Charterers' NYPE proforma which Charterers to provide for Owners' comments".

The above communication meant that the "fixture" or charter party would be subject to the further terms and conditions of a charter that Charterer previously entered into and concluded with another party.  This prior agreement was referred to as Charterers "NYPE proforma" and Charterers agreed to provide it to Owners so they could comment on it.  A copy of the March 16, 2007 recap is attached as Exhibit B.

4.       Subsequently, Charterers forwarded their "NYPE proforma" which was the MV "Lucky Rose" C/P dated December 21, 2005 which is attached as Exhibit C.  The

details between Owners and Charterers were agreed upon on March 19, 2007.  The final

recap of fixture dated 19 March 2007, Exhibit A, stipulated as follows:

> "Otherwise as per C/P proforma MV 'Lucky Rose' C/P 21
> December 2005 logically amended in accordance with <u>main terms</u>
> and with following changes".  (underscoring added)

At this point in the negotiations, all of the main terms and details were agreed upon.

     5.      However, clause 49, the arbitration clause, of MV "Lucky Rose" C/P 21

December 2005, was not the subject of discussion when the other C/P terms or details

were discussed/negotiated.  Clause 49 of the "pro forma M/V Lucky Rose" provided for

New York law and Charterers agree that in the M/V Orla C/P shall be governed and

construed in accordance with English law.  After having agreed that English law applied

to the C/P, it would be logical to amend Clause 49 to provide for London arbitration.

Charterer takes the position that Clause 49 should not be amended to provide for London

arbitration.   In my opinion, Clause 49 should be amended to provide for London

arbitration because English law was one of the main terms that was negotiated.  It is not

logical to have English law apply and then conduct the arbitration in New York before

New York arbitrators who have to apply English law.

     6.      Attached as Exhibit D is clause 49 of the "C/P proforma Lucky Rose C/P

21 December 2005" which I have amended as it would read if it were logically amended.

LMAA refers to the London Maritime Arbitrators Association.

7.    In my long experience as a shipbroker, I do not recall any charter parties providing for the application of English law in the main terms of the fixture that would specify a place for arbitration other than London.

Dated:    New York, New York
          June 12, 2008

                                        _____
                                               MAREK TKACZUK

Sworn to before me this 12th
day of June, 2008.

_____
       NOTARY PUBLIC

MARITZA LEON
Notary Public, State of New York
No. 01LE6003817
Qualified in Nassau County
Commission Expires March 9, 2010

# EXHIBIT A

MÁREK IWANIURA            POLII-024
1

**Temat:** [Chartering] mv Orla / Caytrans - recap of clean fixture
**Nadawca:** <broker@polsteamusa.com>                    KP: 8434
**Data:** Mon, 19 Mar 2007 15:18:22 -0400
**Adresat:** "CHARTERING \(CHARTERING\)" <chartering@polsteam.com.pl>

Marek / Robert

Thks vm for fixture

RECAP OF CLEAN FIXTURE WITH ALL SUBS IN ORDER

C/P DD 19TH MARCH 2007

Acct: Caytrans Project Services ltd, New Orleans, la

M/V 'ORLA'
GRD/SD/SELFTRIM/BLT 99
FLAG/CREW  MALTESE/POLISH
17,059 MTS DWAT ON 8.55 M SSW
TPC 29.7
INT'L GRT/NRT 11,848/5,452
PANAMA  9,967
SUEZ GRT/NRT 12,410.32/10,260.83
L/B  149.47 / 22.99 M
HO/HA 4 BOX SHAPED /4
HA DIMS (L X B): 1) 19.2 X 10.6 M  2-4) 19.2 X 19.0 M HA CVRS: FOLDING TYPE,
HYDRAULICALLY OPERATED, KVAERNER TT STRENGTH: 1-4) 13.5 MTS/SQM
2 CR X 25 MTS (RADIUS 3-22 M), no grabs on board
TTL GRN CAPA 750,790 CBFT
B/DOWN BY HO:
1) 155,456    2) 195,925    3) 201,753    4) 197,656
S/C (IN GOOD WEATHER CONDITIONS UPTO/INC BEAUFORT WIND SCALE 3 AND DOUGLAS
SEA STATE 3, NO ADVERSE CURRENT, NO NEGATIVE INFLUENCE OF SWELL):
B/L AV 13.5 KN ON 21.5 IFO + 0.05 MT MDO
P                    2.5 IFO + 0.5 MDO GEAR IDLE
                     3.8 IFO + 0.5 MDO GEAR WORKING VSL MAY BURN MDO WHEN
MANOUVRING IN NARROW WATERS/PORTS/CANALS BUNKERS QUALITY STANDARDS:
IFO380CST - ISO RMG 35, MDO - ISO DMB IF WEATHER CONDITIONS ARE WORSE THEN
BEAUFORT 3 AND/OR DOUGLAS 3 SCALE THEN VESSEL'S ACHIEVED PARAMETERS CANNOT
BE CLAIMED

- OWNERS: POLSTEAM SHIPPING COMPANY LIMITED, LIMASSOL, CYPRUS
  AS DISPONENT OWNERS
- CLASS: LLOYD'S

All DETS "ABOUT"

Masters stowplan bss milled rice stowing 44'

stowplan:
h1 - 3590 mt full
h2 - 3438 mt slack
h3 - 4658 mt full
h4 - 4564 mt full
ttl = 16250 mt

Master confirm no strapping bagging securing required

- last 3 cargoes: steel prods/ferts/wheat
- nationality of officers/crew: polish

- Owners provided ISM DOC ISPS and PandI club entry as part of subjects

- tct one laden leg via USG with us gov licencenced cgo of milled rice in
bulk chopt option 2nd laden leg in direct continuation. option to be
declared latest prior arrival Cuba.

1 u 4

MAREK IWANIUKA 

- trading always via safe port(s)/safe berth(s)/always afloat.

- Delivery: dop Houston atdnshinc

- Redelivery: dop 1 sp Cuba atdnshinc

- 1st load port will be Freeport TX

- l/c mar 24 - 30 March 2007

- Vessel to be ready standard grain clean. Any additional cleaning/
inspections required due to the nature of cargo to be for Charterers'
account/time and vessel not to be off-hired if vessel is rejected due to
that fact.

- duration about 25days if 1 laden leg. About 50days if 2 laden legs

- hire us$ 21,000 day prorata payable 15days in advance less commission
only. 1st hire including estimated bunker consumption to be paid on vessel's
delivery

- Bunkers.
Bunkers on dely: abt 495 mt IFO/abt 20 mt MDO. Charts to pay for estimated
bunker consumption on vessel's delivery.
Bunkers on redely: as on board
Prices both ends: USD 300 pmt IFO, USD 550 pmt MDO.
Owners have the right to bunker prior redelivery for their own acct provided
same does not interfere with Charts operations.

- cve: 1250/month pr

- ilohc 2500 ls excluding removal of dunnage and fittins, if any, which to
be done by Charts at their time/risk/expenses

- INTERMEDIATE HOLD CLEANING
    WEATHER, TIME AND SHORE LABOUR/REGULATIONS PERMITTING, CHRTRS TO
    HAVE THE OPTION OF CREW CLEANING VSLS HOLDS. SUCH CLEANING TO BE
    PERFORMED IN ACCORDANCE WITH BEST SEAMANSHIP BUT WITHOUT G'TEE TO
    OBTAIN USDA/NCB OR EQUIVALENT CERTIFICATES.
    INTERMEDIATE HOLDS CLEANING NOT TO INCLUDE REMOVAL OF DUNNAGE AND
    FITTINGS, WHICH TO BE DONE BY CHRTRS AT THEIR TIME/RISK/EXPENSE.
    CHRTRS TO PAY LMPS USD 2500.
    THE LUMPSUM PAYMENT TO COVER LABOUR COSTS ONLY. ANY CHEMICALS
    AND/OR FRESH WATER, IF REQUIRED FOR CLEANING, TO BE
    PROVIDED BY CHRTRS FOR THEIR ACCNT.

- cargo exclusions
cargo to be harmless, non dangerous, no IMDG classed, loaded in accordance
with IMO regulations. Cargo to be always us gov licensed.
All cargoes excluded except lawful grains in bulk always excluding sunflower
seeds/expellers and rice but incl milled rice in bulk.

- Trading exclusions:
    All countries excluded except: USA, Cuba.

- English law to apply

BIMCO ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005

(a)(i) The Owners shall comply with the requirements of the International
Code for the Security of Ships and of Port Facilities and the relevant
amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and
"the Company" (as defined by the ISPS Code). If trading to or from the
United States or passing through United States waters, the Owners shall also
comply with the requirements of the US Maritime Transportation Security Act
2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the
relevant International Ship Security Certificate (or the Interim
International Ship Security Certificate) and the full style contact details

MAREK IWANIURA 

of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

BIMCO U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a)  If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i)  Have in place a SCAC (Standard Carrier Alpha Code);
ii)  Have in place an ICB (International Carrier Bond);
iii)  Provide the Owners with a timely confirmation of i) and ii) above; and

iv)  Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

MAREK IWANIURA           

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d)  The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

- 2.50pct addcomm

- Otherwise as per C/P proforma mv "Lucky Rose" c/p 21st December 2005 logicaly amended in accordance with main terms and with following changes

Line 78: del "and direction"
Line 79: del "and Tally Clerk's"
Line 90: del "The vessel has natural ventilation only"
Line 101: after "extra" insert "directly related"
Line 116: del "1990 and any amendments thereafter" and in this place insert "1994"
Line 142: del "sufficient"

Rider clauses

Cl.37: reverting with Owners bankers
Cl.38, line 5: del "all direct expenses and"
Cl.41: as per main terms
Cl.42: as per main terms
Cl.44: as per main terms
Cl.50: as per main terms
Cl.51: as per main terms
Cl.52: del "1993" and insert "2004"
Cl.61: to remain as per proforma except that two persons from Charterers are to sign.
Cl.65: del all
Cl.66: del all
Replace CONWARTIME 1993 with CONWARTIME 2004 Addendum Number 1: del all

Add BIMCO Stowaways Clause for Time Charters

End recap

Thks vm for support.

Regards
Robert Kapsa

While replying please use e-mail: chartering@polsteamusa.com

_____
chartering mailing list
chartering@polsteam.com
http://manat.polsteam.com/cgi-bin/mailman/listinfo/chartering

# EXHIBIT B

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

Charterers to be authorized by the Master to issue and sign such Bills of Lading but only in strict accordance with mate's receipt. No Waybills, no Liner nor Through Bills of Lading to be issued.

### 33. STEVEDORE DAMAGE / DAMAGE TO HULL OR MACHINERY

Notwithstanding anything contained herein to the contrary the Charterers shall pay for any and all damage to the vessel caused by Stevedores provided the Master has notified the Charterers' and/or their Agents in writing as soon as practical but not later than 24 hours after any damage is discovered but prior to sailing port except for hidden damages. Master to attempt to get responsible party or acknowledge damage in writing. In case of any and all damage(s) affecting the vessel's seaworthiness, cargoworthiness and/or the safety of the crew and/or affecting the trading capabilities of the vessel, the Charterers shall immediately arrange for repairs of such damage(s) at their expense/time and the vessel is to remain on hire until such repairs are completed and passed by the vessel's classification society.
Any and all damage(s) not described under point a above shall be repaired after redelivery concurrently with owners' works. In such case no hire and/or expenses will be paid to the owners except insofar as the time and/or the expense required for the repairs for which the charterers are responsible exceed the time and/or expenses necessary to carry out the owners' works.

### 34. CREW ASSISTANCE

Timecharter hire to include rendering customary assistance by the crew including, opening and closing of hatches, shifting operations and docking, bunkering, supervising cargo operations etc.
The timecharter hire is inclusive of all overtime work done by Master, officers and crew.
Above services to be rendered providing port regulations permit.

### 35. CHARTERERS' MARKINGS

Deleted.

### 36. CHANGE OF FLAG

Owners are not allowed to change vessel's flag or substitute vessel during the currency of this Charter without obtaining Charterers' prior approval.

### 37. PAYMENT OF HIRE

Payment of hire to be made to:

| | | |
|---|---|---|
| ACCOUNT NAME | : | NORTH POLE NAVIGATION |
| ACCOUNT NO | : | 410.00.02.548 (USD) |
| BANK | : | THE ECONOMY BANK N.V. |
| | | PROF. W.H. KEESOMLAAN 5 |
| | | 1183DJ AMSTELVEEN |
| | | THE NETHERLANDS |

2

## RIDER TO
## M/V "LUCKY ROSE"
## CHARTER PARTY DATED DECEMBER 21, 2005

SWIFT              :     TEBUNL2A

CORRESPONDING BANK (USD):
BANK OF NEW YORK, N.Y.
ACCOUNT NO      :    8900386169
SWIFT              :    IRVTUS3N

Further to clause 5: Where there is failure to make 'punctual and regular payment' including first hire payment, due to weekends or omissions of Charterers' employees, bankers, agents, where there is absence of intention to fail in making payment as set out, Charterers shall be given by Owners two banking days to rectify the failure and where so rectified, the payment shall stand as punctual and regular payment.

## 38. SUSPENSION OF HIRE

Further to clause 15, it is agreed that in case hire is suspended for any reason as mentioned in clause 15, or elsewhere in this Charter Party, hire shall remain suspended fully or pro rata until vessel is again in the same position or an equidistant position in relation to her destination as when hire was suspended, and all direct consequential losses suffered ~~and all direct expenses~~ and all direct proven expenses incurred during such period, including bunkers consumed, shall be for the Owners' account.

In the event of breakdown, fully or partly, of cargo gear by reason of disablement or insufficient power, the full hire shall cease to count fully or pro rata for time actually lost. The Owners will only employ shore gear if crane(s) damaged is not rectified within maximum 8 hours. However, also agreed that during the hours included but limited to maximum 8 hours the hire will be suspended proportionally.

In the event of loss of time due to blockade or boycott of the vessel in any port or place by shore labour or others (whether arising from Government restrictions or not) by reason of the ownership / management / operation or control; the terms and conditions on which the members of the crew are employed; the trading of the vessel since she was built; the trading of any other vessel under the same ownership / management / operation or control; any alleged physical or documentary deficiency in relation to the vessel's safety or cargo gear; or by any other reason which relates to the Owners, payment of hire shall cease for the time thereby lost and all direct expenses and other direct consequences to be for Owners' account. But in the event of loss of time due to strikes/boycotts of the labors or any other related parties at the ports not by the reason of the vessel/ownership/management then, time to count and the vessel will be on hire.

Any delay, expenses or fines incurred on account of smuggling, if caused by the officers and crew, to be for Owners' account.
Charterers have the option of adding any or all off-hire periods to the duration of the Charter and vice versa if caused by charterers' / charterers' employees to be for charterers' account. U.S. Anti Drug Abuse Act 1986 Clause will be applied.

## 39. DEVIATION

Should the vessel be put into a port for causes for which vessel is responsible except for reasons as stipulated in cl.19, all such charges incurred thereto, shall be paid for

3

RIDER TO
M/V "LUCKY ROSE"
CHARTER PARTY DATED DECEMBER 21, 2005

by Owners and the hire shall be suspended from the time of her putting back until she is again in the same position and voyage resumed therefrom, unless otherwise agreed.

**40. DEDUCTIONS FROM HIRE**

Charterers have the right to withhold from charter hire such amounts due to them for undisputed off-hire and for Owners' disbursements but max USD 500, advances, or other amounts which undisputable are to be for Owners' account, on basis of a reasonable estimation. However, final accounting to be arranged by Charterers as promptly as possible but maximum within ten days after redelivery, and Charterers to produce supporting evidence for such deductions but max. 500 US$ per port.

Should the vessel be on her voyage towards the port of redelivery at a time a payment of hire becomes due, said payment shall be made for such length of time as Charterers or their agents may consider to be the estimated time necessary to complete the voyage, which not to be unreasonably withheld, less estimated disbursements arranged by the Charterers for Owners' account, and when vessel is redelivered to Owners or their agents, any difference shall be refunded by Owners or shall be paid by the Charterers, as the case may require.

**41. SPEED & CONSUMPTION**

Owners warrant that, throughout the duration of the charter, the vessel will be capable of maintaining an average speed of 13 knots, on a consumption of about 25 mt per day IFO, laden on 13 knots about 25 mt per day IFO at 180 cst MDO at port: idle 1.5 mt – day at sea: 2.8 mt – day – gear working 3 mt – day  - bunker description: IFO: iso 8217 rme – 25 180 cst – MDO: iso 8217 dmb distillated.
The vessel's speed capability is to be calculated on basis of the vessel's log extracts or voyage reports (unless manifestly incorrect) and by an independent weather bureau reports. In case of consistent discrepancy between log books and the independent routiner's company's reports, unless a mutual solution is found, the case to be referred to arbitration.
Set-off shall be allowed for saved bunkers, if any, against Charterers possible claim for speed deficiency.

**42) REDELIVERY – INTERMEDIATE HOLD CLEANING**

Charterers have the option to redeliver the vessel unclean against paying a total of USD 2,500.00 / USD 500.00 per hold actually cleaned.

**43. ARREST / DETENTION**

Should the vessel be arrested or detained during the currency of this Charter at the suit of any person having or purporting to have a claim against or any interest in the vessel, hire shall not be payable in respect of any period whilst the vessel remains under arrest / detention or remains unemployed as the result of such arrest / detention, and the Owners shall reimburse the Charterers any direct losses suffered or direct expenses incurred as a result hereof. It is understood that during such arrest if the vessel's operations are not interrupted the vessel is to be fully on-hire.

4

### RIDER TO
### M/V "LUCKY ROSE"
### CHARTER PARTY DATED DECEMBER 21, 2005

Owners realize that USCG has placed vessel on "high interest" status as a result of crew situation, desertions and lack of visas.   Owners have already taken all necessary steps to correct this situation.   In the event that despite Owners best efforts, the USCG refuses entry to U.S.A. of the vessel in the coming calls due to re-occurrence of similar incidence(s) beyond Owners'/Masters' control, then Charterers agree to cancel balance of charter without penalty to Owners.

### 44. BUNKERS

. Charterers will use their bunkers that had been supplied at New Orleans, bunker quantities on redelivery to be minimum 170 metric tons IFO and 65 metric tons MDO. If Charterers use Owners' bunkers on board the vessel then they will pay to Owners the bunkers they consumed at U.S $300.00 for IFO and U.S. $600.00 for MDO.

Owners are allowed to bunker the vessel for their own account at the port prior to re-delivery provided it does not interfere with the Charterers' operation or cargo intake.

### 45. AGENCY

Owners are entitled to appoint their own agents at any port or to use the agents appointed by Charterers against payment / reimbursement of any fee charged by the agents which relate to Owners' business.  Charterers shall not be responsible for any act or omission by the agents in this relation.

### 46. GARBAGE

Garbage removal expenses and excise duty to be for Owners' account, except those pertaining to the cargo. Compulsory garbage removal to be for Charterers' account.

### 47. CERTIFICATES

The vessel to have valid cargo gear certificates for the duration of the Charter, and vessel to comply with any safety regulations and / or requirements in effect at any port within the trading limits.
Vessel to have on board all certificates necessary to operate in any port within the trading limits.  Owners to pay all consequential losses including loss of time resulting from their failure to comply with the aforementioned.

Charterers to guarantee that the vessel will not be restricted or delayed in any way upon returning to USA as a result of carrying this cargo to Cuba.

Charterers will furnish a copy of "D" License issued by the United States department of Commerce; Bureau of Industry and Security to Owners on fixing main terms. Charterers also to furnish a copy to Master at loading port.

Owners P&I Club Letter of Indemnity for non presentation of Bills of Lading at discharge port to be signed only by Charterers not bankers/receivers.

5

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

**48. RETURN PREMIUMS**

Deleted.

**49. ARBITRATION**

This Charter Party shall be governed by and construed in accordance with US Law. Any dispute arising out of or in connection with this Charter Party or Bills Lading issued hereunder, shall be referred to arbitration in New York with SMA. The dispute to be settled by a single arbitrator who is to be appointed by the parties hereto. If the parties cannot agree upon the appointment of an arbitrator, the dispute shall be settled by three arbitrators, each party appointing one arbitrator, the third being appointed by the two so chosen. If the arbitrators fail to agree on the appointment of the third arbitrator, such appointment shall be made by the Society of Maritime Arbitrators (SMA).

If either of the appointed arbitrators refuses or is incapable of acting, the party who appointed him shall appoint a new arbitrator in his place.

If one party fails to appoint an arbitrator, either originally or by way of substitution, the Society of Maritime Arbitrators (SMA) shall, after application from the party having appointed his arbitrator, also appoint an arbitrator on behalf of the party in default.

Disputes involving amounts less that USD 50,000 shall be settled according    to the Small Claims Procedure.

**50. TRADING LIMITS**

Vessel To Trade Always Within lwl Excluding: Sweden, Norway, Finland, Denmark, Iceland, USA, Canada, Cuba, Haiti, Algeria, Libya, Syria, Lebanon, Iran, Iraq, Toc, Albania, Yugoslavia, Sea Of Azov, Georgia, Magellan / Cape Horn, Jordan, Nigeria, Angola, Somalia, Sudan, Israel, Yemen, Ethiopia, Eritrea, Liberia, Ghana, Zaire, Guinea, Congo, Gambia, Gabon, Guinea Bissau, Togo, Sierra Leone, Senegal, Ivory Coast, Benin, Cameroon, Nicaragua, St. Salvador, Amazon, Australia, New Zealand, Indonesia, North Korea, Cambodia, Vietnam, Cis Pacific  Ports, S, Myanmar, War And Warlike Zones.

Vessel neither to follow an ice braker nor to force ice.

Vessel is not allowed to sail / trade directly between P.R. China and Taiwan and vice versa.

**51. CARGOES ALLOWED**

Corn allowed only. No deck cargo allowed.

Owners/Master to confirm the vessel can load about 25,000 mt bulk corn with maximum stowage factor 48 or about 25,000 mt bulk wheat with maximum stowage of 48 cubic feet however as to loadable quantities Charterers to reconfirm with Master, as they did before, the exact quantities based on the type of cargo and the maximum stow factors given.

**52. WAR RISK INSURANCE**

Conwartime Clause 1993 to apply.

6

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

If any additional war risk insurance premium to be for Charterers' account.

53.

If any extra overage insurance premium due to vessel's age to be for Charterers' account.

54.
Delete.

55.

Deleted.

56.

Deleted.

57.    BIMCO STANDARD ISM CLAUSE FOR VOYAGE AND
       TIME CHARTERPARTIES

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

**58. CREW SERVICES**

Hire to include the following services from crew:
1.    Shifting and warping vessel during loading and / or discharging alongside the berth or from one berth to another.
2.    Bunkering.
3.    Raising and lowering derricks or rigging cranes and preparation for loading and discharging.
4.    Opening and closing of hatches in preparation for and during loading and / or discharging. Officers and crew to shape up vessel's hatches and derricks or cranes as much as possible as far as weather permits prior to vessel's arrival at loading and / or discharging port.
5.    Removing and replacing beams in preparation of loading and discharging.
6.    Supervision of loading and / or discharging.
7.    Crew including one (1) officer supervising cargo operations on deck during loading and discharging.
8.    It is understood that if any of the above services are prohibited by shore regulations same to be provided by Charterers. However, crew will do

7

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

their best to perform applicable services while at sea provided same does not affect vessel's seaworthiness.

The services of the crew do not include the securing and lashing of containers, neither the securing lashing and / or strapping of bulk cargo if there is empty space or cargo slack on holds and always provided that weather permits.

**59. HIRE TO BE PAID TO:**

Deleted.

**60. ICE CLAUSE**

Deleted.

**61. LOI CLAUSE**

In case original bills of lading are not available at the port/s of discharge, Owners agree to discharge / release the cargo against a letter of indemnity (LOI) in Owners, P & I Club standard wording (as given below), signed by Charterers and also receivers if same obtainable.

LOI to be drawn on Charterers' headed paper and to be signed by Charterers' designated person showing full name and place in the company. LOI to be faxed to Owners for approval and original one to be mailed as soon as possible.

**62. PRE-LOADING CARGO SURVEY CLAUSE**

Deleted.

**63. HAMBURG RULES CHARTER PARTY CLAUSE**

Neither the Charterers nor their agents shall permit the issue of any Bill of Lading, Waybill or other document evidencing a contract of carriage incorporating, where not compulsorily applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague / Visby Rules. Charterers shall indemnify the Owners against any liability, loss or damage which may result from any breach of the foregoing provisions of this clause.

**64. INTERCLUB AGREEMENT**

Notwithstanding any provision to the contrary contained in this Charter Party, cargo claims, if any, are to be settled in accordance with the Interclub New York Produce Exchange Agreement, as amended on September 1996.

**65.**

Charterers' option to purchase the vessel during period at price to be agreed.

8

**RIDER TO
M/V "LUCKY ROSE"
CHARTER PARTY DATED DECEMBER 21, 2005**

66.

*del*

During the t/c period, Owners have the right to substitute M/V "Lucky Rose" with equally (similar meaning type, intake, gear, P and I, age etc.) performing tonnage as well as to sell their vessel with t/c attached.  Same to be consistent with Charterers shipment schedule.

<u>BIMCO Standard War Risks Clause for Time Charters, 1993
Code Name: "CONWARTIME 1993"</u>

(1)    For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, civil commotion, warlike operations, the laying of mines ( whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and / or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2)    The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, in the reasonable judgement of the Master and / or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3)    The Vessel shall not required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and / or confiscation.

(4)    (a)    The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premium and / or calls thereof shall be for their account.

9

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

(b)   If the Underwriters of such insurance should require payment of premiums and / or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and / or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5)   If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6)   The Vessel shall have liberty:
(a)   To comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions.

(b)   To comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance.

(c)   To comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement

(d)   To divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier.

(e)   To divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(7)   If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

10

## RIDER TO
## M/V "LUCKY ROSE"
## CHARTER PARTY DATED DECEMBER 21, 2005

(8)   If in compliance with any of the provisions of sub-clauses (2) to (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charterparty.

## WAR CANCELLATION CLAUSE

Either party may cancel this Charter Party on the outbreak of war or hostilities:

(a) between any two or more of the following countries, the United States of America, Russia, the United Kingdom, France and the People's Republic of China, or
(b) between ..................................

*(a) and (b) are optional, the inapplicable option should be deleted.*

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York / Antwerp Rules, 1974 as amended 1990 and any subsequent amendment, if any, but where *1994* the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply.

New Jason Clause
"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or Owners of the goods to the carrier before delivery" and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

## U.S. Customs Advance Notification/AMS Clause for Time Charter Parties

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of

11

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii) Provide the Owners with a timely confirmation of i) and ii) above; and
iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**U.S. Tax Reform 1986 Clause**

Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

**ISPS/MTSA CLAUSE FOR TIME CHARTER PARTIES 2005**

(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

12

**RIDER TO
M/V "LUCKY ROSE"
CHARTER PARTY DATED DECEMBER 21, 2005**

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

*"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".*

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

*Notwithstanding any other provisions in this Clause, or any other provision in this charter party, any and all costs and delays, if any, arising from vessel's crew being Turkish to be for Owners' account.

## U.S. Anti Drug Abuse Act 1986 Clause for Time Charters

(a) In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest

**RIDER TO**
**M/V "LUCKY ROSE"**
**CHARTER PARTY DATED DECEMBER 21, 2005**

degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

(b) In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter.

<u>Lucky Rose / Caytrans  Charter Party Dated; December 21, 2005</u>

### <u>Addendum  Number 1</u>:
Date: December 23, 2005

Owners in consideration of good cooperation, herewith, in good faith, give to Charterers the option for 9-11 months to be declared by latest vessel's arrival at discharge port with the 2nd voyage under period charter.

Owners  ON BEHALF OF        North Pole Navigation Co. Ltd   Charterers

AKTIF
DENIZCILIK
BİLGİ PLATFORM MÜMESSİLLİK
SANAYİ ve TİCARET A.Ş.

# EXHIBIT D



**RIDER TO
M/V "LUCKY ROSE"
CHARTER PARTY DATED DECEMBER 21, 2005**

**48. RETURN PREMIUMS**

Deleted.

*London*

**49. ARBITRATION**

*English Law*

This Charter Party shall be governed by and construed in accordance with ~~US Law~~.
Any dispute arising out of or in connection with this Charter Party or Bills Lading *LMAA*
issued hereunder, shall be referred to arbitration in ~~New York~~ with ~~SMA~~. The dispute
to be settled by a single arbitrator who is to be appointed by the parties hereto. If the
parties cannot agree upon the appointment of an arbitrator, the dispute shall be
settled by three arbitrators, each party appointing one arbitrator, the third being
appointed by the two so chosen. If the arbitrators fail to agree on the appointment of
the third arbitrator, such appointment shall be made by the Society of Maritime
Arbitrators ~~(SMA)~~. *LMAA*
If either of the appointed arbitrators refuses or is incapable of acting, the party who
appointed him shall appoint a new arbitrator in his place.

*LMAA* If one party fails to appoint an arbitrator, either originally or by way of substitution, the
~~Society of Maritime Arbitrators (SMA)~~ shall, after application from the party having
appointed his arbitrator, also appoint an arbitrator on behalf of the party in default.

Disputes involving amounts less that USD 50,000 shall be settled according    to the
Small Claims Procedure.

**50. TRADING LIMITS**

Vessel To Trade Always Within Iwl Excluding: Sweden, Norway, Finland, Denmark,
Iceland, USA, Canada, Cuba, Haiti, Algeria, Libya, Syria, Lebanon, Iran, Iraq, Toc,
Albania, Yugoslavia, Sea Of Azov, Georgia, Magellan / Cape Horn, Jordan, Nigeria, *as per*
Angola, Somalia, Sudan, Israel, Yemen, Ethiopia, Eritrea, Liberia, Ghana, Zaire, *main term*
Guinea, Congo, Gambia, Gabon, Guinea Bissau, Togo, Sierra Leone, Senegal, Ivory
Coast, Benin, Cameroon, Nicaragua, St. Salvador, Amazon, Australia, New Zealand,
Indonesia, North Korea, Cambodia, Vietnam, Cis Pacific  Ports, S, Myanmar, War
And Warlike Zones.
Vessel neither to follow an ice braker nor to force ice.
Vessel is not allowed to sail / trade directly between P.R. China and Taiwan and vice
versa.

**·51. CARGOES ALLOWED**

*as per*
Corn allowed ~~only~~. No deck cargo allowed. *main term*

Owners/Master to confirm the vessel can load about 25,000 mt bulk corn with
maximum stowage factor 48 or about 25,000 mt bulk wheat with maximum stowage
of 48 cubic feet however as to loadable quantities Charterers to reconfirm with
Master, as they did before, the exact quantities based on the type of cargo and the
maximum stow factors given.

**52. WAR RISK INSURANCE**

Conwartime Clause ~~4993~~ to apply.

*2004*